Richard H. ABREY, Plaintiff,

v.

Dr. Jur. Walther REUSCH and Douglas W. Hartman, members, Dr. Walther Skaupy, Dr. Walter Clemens and Richard D. Kearney, deputy members, and David A. Stretch, chairman, of the Board for the Validation of German Bonds in the United States (Bereinigungsstelle fuer deutsche Bonds in den Vereinigten Staaten); Vereinigte Stahlwerke Aktiengesellschaft (United Steel Works Corporation); Rheinstahl-Union Maschinen-Und Stahlbau Aktiengesellschaft; Gelsenkirchener Bergwerks-Aktiengesellschaft; Hamborner Bergbau Aktiengesellschaft; Erin Bergbau Aktiengesellschaft; Dortmund-Hörder Hüttenunion Aktiengesellschaft; Rheinische Röhrenwerke Aktiengesellschaft; Hüttenwerke Phoenix Aktiengesellschaft; Rheinisch-Westfälische Eisen-Und Stahlwerke Aktiengesellschaft; Hüttenwerke Siegerland Aktiengesellschaft; and Irving Trust Company, and Dillon, Read & Co., Defendants.

United States District Court
S. D. New York.
March 27, 1957.
Supplemental Opinion April 12, 1957.

338

Curtis, Mallet-Prevost, Colt & Mosle, New York City, Ernest A. Gross, New York City, of counsel, for plaintiff.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, S. Hazard Gillespie, Jr., Frederick A. O. Schwarz, New York City, Edmund T. Ross, Eastchester, N. Y., of counsel, for defendants Dr. Jur. Walther Reusch and Douglas W. Hartman, members, Dr. Walther Skaupy, Dr. Walter Clemens and Richard D. Kearney, deputy members, and David A. Stretch, chairman, of the Board for the Validation of German Bonds in the United States.

Shearman & Sterling & Wright, New York City, Chauncey B. Garver, Charles C. Parlin, Jr., Robert Carswell, New York City, of counsel, for defendants Vereinigte Stahlwerke Aktiengesellschaft (United Steel Works Corporation), Rheinstahl-Union Maschinen- and Stahlbau Aktiengesellschaft, Gelsenkirchener Bergwerks-Aktiengesellschaft; Hamborner Bergbau Aktiengesellschaft, Erin Bergbau Aktiengesellschaft; Dortmund-Horder Hüttenunion Aktiengesellschaft, Rheinische Röhrenwerke Aktiengesellschaft, Hüttenwerks Phoenix Aktiengesellschaft, Rheinisch-Westfälische Eisenund Stahlwerke Aktiengesellschaft, Hüttenwerke Siegerland Aktiengesellschaft and Irving Trust Co.

Cahill, Gordon, Reindel & Ohl, New York City, for defendant Dillon, Read & Co.

HERLANDS, District Judge.

The pending motions in this litigation present a problem of judicial review in the field of international administrative law.

Plaintiff holds two hundred and forty-five $1,000 bearer bonds issued by a German corporation, Vereinigte Stahlwerke Aktiengesellschaft. (This corporation and its successors are referred to as the "Steel Works.") Those bonds have been declared invalid by an international administrative agency, the "Board for the Validation of German Bonds in the United States." This Board (referred to herein as the "Validation Board") functions under a 1953 treaty and related legislation operative between the United States and the Federal Republic of Germany.

Plaintiff claims that he is entitled to have the issue of the validity of the bonds determined at a full judicial trial before the court and a jury.

Defendants oppose plaintiff's demand for a *de novo* hearing before the court. They claim that the 1953 treaty and related laws provide for review of the

Board's decision only in the traditional sense of "judicial review"—a review of the administrative record in order to ascertain whether there was substantial evidence to sustain the Board's determination of invalidity.

The fundamental question thus posed concerns the nature and scope of the review provided by the 1953 treaty and related laws. The answer to that question requires a consideration of (1) the history of German Dollar Bonds during the period between the 1920's and 1945; (2) the problem created in May 1945 by the Russian Army's seizure of negotiable German Dollar Bonds; and (3) the procedures devised in 1952 and 1953 by the United States and Germany, through specific legal measures, to screen invalid Dollar Bonds.

*History of German Dollar Bonds*

After the First World War, and principally between 1924 and 1930, a large number of bearer Dollar Bonds were sold by German enterprises. These bond issues were underwritten in the United States, and were payable through corporate trustees or paying agents in the United States.

Prior to the outbreak of the Second World War, many of these Dollar Bonds had been repurchased and reacquired by the issuers for eventual retirement, and later submitted to meet sinking fund and amortization requirements. Such reacquired bonds were retained in Germany and no longer represented valid obligations.

During the Second World War, it was impossible to present such bonds to the American trustees or paying agents for cancellation. As a consequence, large numbers of these uncancelled bearer Dollar Bonds, in negotiable form, were held in the vaults of German banks.

*Problems Created by Russian Seizure of Dollar Bonds*

After the surrender of Germany, Russian occupation forces seized the uncancelled, negotiable Dollar Bonds which they found in the German bank vaults within the area of their control. The face amount of such bonds has been estimated at $350,000,000. These looted bonds were returned to circulation by the Russians.

At the same time, other German Dollar Bonds, amounting to about $250,000,-000, were in the legitimate possession of their bona fide purchasers. There was thus a real possibility that the eventual holders of the looted bonds would share the available assets (limited available foreign exchange) of the German obligors equally with the legitimate bondholders, a large number of whom were nationals of the United States. Moreover, the free and open trading in the United States of all German Dollar Bonds was impeded by the uncertainties arising from the situation described above.

*Objectives of Screening Procedures*

In order to avoid the indicated consequences and to facilitate the settlement of German external debts, the United States and other nations cooperated with the German Federal Government in creating a procedure whereby all foreign currency bonds, including Dollar Bonds, might be screened. The specific objective was to determine whether they were valid or were among those originally seized by the Russians. In that way, holders of $350,000,000 worth of looted Dollar Bonds would not be permitted to share in the limited available foreign exchange assets with the holders of $250,000,000 worth of legitimate Dollar Bonds.

The screening procedure for separating legitimate from Russian-stolen bonds and the controlling criteria were set forth in a number of measures. The central idea was to require all German foreign currency bonds, including Dollar Bonds, to be submitted for a determination of their validity.

The pertinent measures, listed chronologically, are:

1. The Validation Law of August 25, 1952

2. The First Implementing Ordinance of February 21, 1953

3. The Agreement on Validation Procedures of February 27, 1953

4. The Second Implementing Ordinance of March 13, 1953

5. The Treaty of April 1, 1953

*Validation Law*

The Validation Law (Law for the Validation of German Foreign Currency Bonds) was enacted by the German Government on August 25, 1952. It established the procedures and criteria for validation. Its material provisions will be discussed in the course of this opinion.

The schedule of foreign currency bonds attached to the Validation Law lists the bonds to which the provisions of the Validation Law apply. Subdivision C.(IV) lists the bonds which had been offered in the United States. Item 81 of that subdivision designates the issue of bonds which are involved in this litigation: "Vereinigte Stahlwerke Aktiengesellschaft—6½%—20 year Sinking Fund Debentures, Series A—Due July 1, 1947."

The Validation Law is set forth at pages 33 to 89 of Exhibit B, attached to the complaint herein.

*First Implementing Ordinance*

The "First Implementing Ordinance" of February 21, 1953, issued under the Validation Law, plays no part in this case. It lists additional bonds which came within the coverage of the Validation Law. (See footnote, page 74, Exhibit B, attached to the complaint herein; also Article 1 of Exhibit A, attached to the complaint herein.)

*Agreement on Validation Procedures*

The "Agreement on Validation Procedures" of February 27, 1953, is an executive agreement between the United States and Germany. It is set forth at pages 1 to 17 of Exhibit B, attached to the complaint herein. It is based upon the Validation Law of August 25, 1952. It recites "that the policy of the Federal Republic of Germany embodied in the Validation Law is in conformity with the policy of the United States," and that the United States "wishes to imple-

ment" the provisions of the Validation Law "within the territorial jurisdiction of the United States" by making "mutually satisfactory" provision "as to the procedures therefor within the territorial jurisdiction of the United States."

The "Agreement on Validation Procedures" established a "Board for the Validation of German Bonds in the United States," referred to as the "Validation Board" (Section 2). That Board is composed of three members; one German, who at the time of the decision adverse to plaintiff, was defendant Dr. Jur. Walther Reusch; one American, Douglas W. Hartman; and a chairman, David A. Stretch, a member of the law firm of Simpson, Thacher & Bartlett, of New York. The chairman sits as an umpire in case of a difference between the German and American members. In addition, there were, as the time of the decision of the Validation Board adverse to plaintiff, three deputy members of the Board: Dr. Walther Skaupy and Dr. Walter Clemens, Germans; and Richard D. Kearney, an American. Dr. Skaupy has replaced Dr. Reusch, who has retired as the German member of the Board. Dr. Clemens is at present the only German deputy. William J. McCarthy has replaced Mr. Kearney as the American deputy.

The Agreement on Validation Procedures also dealt with the subject of Arbitration Boards (Section 3); the publication of certain notices (Section 5); and the binding effect of a decision of the Validation Board and of "any decision reviewing a decision of the Validation Board pursuant to a legal remedy allowed by" the Validation Law (Section 7).

*Second Implementing Ordinance*

On March 7, 1953, the German Government approved, and on March 13, 1953 promulgated, a law known as the "Second Implementing Ordinance under the Validation Law for German Foreign Currency Bonds." This ordinance was consented to by the United States. The ordinance is set forth at pages 24 to 29 of Exhibit B, attached to the complaint.

The Second Implementing Ordinance implemented the application of the Validation Law to Dollar Bonds (Article 1); transferred the functions of the "Foreign Representative," as defined in the Validation Law, to the Validation Board (Article 3); prescribed the form, contents and procedures of evidentiary documents and proceedings before the Validation Board (Article 4); prescribed the action and adjudicatory operations of the Validation Board in respect to validating or invalidating bonds presented to it; and provided for "the review of decisions of the Validation Board denying validation" by statutory arbitration boards (Article 6).

*The 1953 Treaty*

On April 1, 1953, the United States and Germany signed the Treaty regarding "Certain Matters Arising from the Validation of German Dollar Bonds." The Treaty became effective on September 16, 1953. The Treaty is Exhibit A, attached to the complaint. The Treaty confirms and, in effect, incorporates by reference the Validation Law of August 25, 1952, the First and Second Implementing Ordinances, and the Agreement on Validation Procedures.

The Treaty provides that no bond shall be enforceable unless and until it shall be duly validated (Article II); that the members of the Validation Board waive immunity from service of process issuing from "courts in the United States in *proceedings brought to determine whether the requirements for validation of bonds under the Validation Law have been met*" (Article III); and that the members of the Validation Board will comply with any judgments, orders or decrees issued by such courts in such proceedings (Article III). (Emphasis supplied.)

Both the Validation Law [Articles 3 (1) No. 1, 21(1), 27] and the Second Implementing Ordinance [Articles 4(3) (6), 5] require the Validation Board to validate a bond duly registered with it if the registrant-bondholder establishes that the bond was "held abroad," which latter term is defined as "located on January 1, 1945, outside the borders of Germany as they existed on December 31, 1937 (hereinafter called "outside Germany")." So far as the case at bar is concerned, the foregoing are "the requirements for validation of the registered bond" which the registrant-plaintiff "has to prove" [Validation Law, Article 24(1)], because he claims that he held the bonds outside Germany on January 1, 1945.

*Details of Procedure Before Validation Board*

The procedure before the Validation Board involves the following features:

(A) If validation is demanded on the ground that the bond was held outside Germany on January 1, 1945, the bond must be registered with the Validation Board [Validation Law, Articles 7(1), 21];

(B) Specified items of information must be set forth together with "the facts relevant for the registration" and "an indication or submission of the evidence" [Validation Law, Article 22; Second Implementing Ordinance, Article 4];

(C) The registered bond must be submitted and delivered to the Validation Board or deposited with a suitable institution, unless the Validation Board provides for some other procedure [Validation Law, Article 23];

(D) The registrant has the burden of proving the requirements for validation. "For this, he may use any evidence, in particular official documents, statements of a bank or broker, and affidavits or other forms of affirmation" [Validation Law, Article 24(1)];

(E) "The issuer as well as the trustees and paying agents shall be given an opportunity to make a statement in respect of the registration and to submit evidence" [Validation Law, Article 24 (2)];

(F) The Validation Board "may make such investigation as" it "considers necessary to ascertain the facts. For this purpose" it "may request the registrant to submit specified documents or other appropriate evidence" [Validation Law,

Article 24(3)]. The Validation Board "may request the courts to take depositions of witnesses and experts and to receive other evidence" [Validation Law, Article 17];

(G) "If there is reason to believe that a bond * * * cannot be validated," the Validation Board "shall inform the registrant of the facts and evidence on which such belief rests and shall give him an opportunity to refute his belief" [Validation Law, Article 24(3)];

(H) The registrant has "a period of three months from the receipt of such request" within which to submit his evidence or statement [Second Implementing Ordinance, Article 5(2)];

(I) "As soon as the Validation Board considers the record as sufficiently complete, it shall make its decision regarding the validation" [Second Implementing Ordinance, Article 5(3)];

(J) "In no case shall validation be denied before the Validation Board has informed the registrant of the facts and the evidence opposing validation and has given him an opportunity to contest them" [Second Implementing Ordinance, Article 5(4)];

(K) The Validation Board "shall validate the bond if" it "is satisfied, after giving such weight as" it "sees fit to all pertinent circumstances, that the registration meets the requirements of Article 3(1) No. 1" [Validation Law, Article 27(1)];

(L) The Validation Board "shall deny the validation of a registered bond if" it "is not satisfied, after giving such weight as" it "sees fit to all pertinent circumstances, that the requirements for a validation by" it "has been met." The Validation Board "shall set forth in writing the reasons for" its decision denying validation [Validation Law, Article 28(1) (2)];

(M) The Validation Board must send the registrant by "registered letter" (or some other equivalent method permitting proof of the date of receipt) a notice of the Board's decision denying validation, the reasons therefor, and "a statement informing him of the legal remedies available to him" [Validation Law, Article 28(3)];

(N) "A decision of the Validation Board validating a bond is not subject to any review. In respect of a decision denying validation, the registrant has only the legal remedies specified in" the Validation Law [Validation Law, Article 29].

■ The provisions of the Treaty, the Validation Law and the related measures clearly satisfy the requirements of due process. United States v. Certain Parcels of Land, D.C.Md.1941, 40 F.Supp. 436; Morgan v. United States, 1938, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1029; Railroad Commission of California v. Pacific Gas & Electric Co., 1938, 302 U. S. 388, 58 S.Ct. 334, 82 L.Ed. 319; National Labor Relations Board v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; National Labor Relations Board v. Jones & Laughlin, 1936, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; Boeing Air Transport Inc. v. Farley, 1935, 64 App.D.C. 162, 75 F.2d 765; Ashbury Truck Co. v. Railroad Commission of State of California, D.C.S.D.Cal.1931, 52 F.2d 263, affirmed, 1932, 287 U.S. 570, 53 S.Ct. 94, 77 L.Ed. 501; Dohany v. Rogers, 1929, 281 U.S. 362, 50 S.Ct. 299, 74 L. Ed. 904; Kadish, Methodology and Criteria in Due Process Adjudication— A Survey and Criticism (1957) 66 Yale Law Journal 319.

The original Record of Proceedings before the Validation Board in this case has been submitted to and studied by the Court. That record consists of forty-six exhibits, a hearing record and seventy procedural papers. That the Validation Board has scrupulously complied with all of the controlling legal provisions is the considered opinion of the Court.[1]

■ Were the function of the Court herein only to determine whether the

1. The appendix to this opinion summarizes the proceedings and evidence before the Validation Board.

Validation Board's decision is supported by the substantial evidence considering the record as a whole [Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456; Shields v. Utah Idaho Central Railroad Co., 1938, 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111; Swayne & Hoyt, Ltd. v. United States, 1937, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659; Arkansas Wholesale Grocers' Ass'n v. Federal Trade Commission, 8 Cir., 1927, 18 F.2d 866, certiorari denied, 1927, 275 U.S. 533, 48 S.Ct. 30, 72 L.Ed. 411], the Court would unhesitatingly determine that question in favor of the Board and dismiss this action. But the heart of this case is the issue concerning the *scope* of the Court's review of the Board's decision. If the Court concludes that the plaintiff is entitled to an independent, full-scale judicial trial, it is immaterial that the Validation Board's decision was based upon the substantial evidence before it. That is the issue raised, in one form or another, by the motions now pending before the Court. We turn then to a consideration of the pleadings and the motion papers.

*The Pleadings*

The complaint, filed May 31, 1956, names three groups of defendants:

1. Reusch, Hartman, Skaupy, Clemens, Kearney and Stretch are sued as members or deputy members of the Validation Board.

2. Vereinigte Stahlwerke Aktiengesellschaft (United Steel Works Corporation) was the German issuer of the debentures (20-year 6½% $1,000. Sinking Fund Debentures, Series A, dated July 1, 1927, due July 1, 1947) held by plaintiff. The nine other German corporate defendants are the successor companies and have succeeded to the liabilities of the Steel Works, whose existence has terminated.

3. Irving Trust Company and Dillon, Read & Co. are the trustee and the paying agent, respectively, under the indenture which created the bond issue in question. They are *pro forma* defendants.

Plaintiff alleges that in or about June 1940, he purchased in good faith two hundred and forty-five of the said bonds in Warsaw, Poland; that at that time, plaintiff was a natural born citizen and resident of Poland; that he became a naturalized citizen of the United States in February 1943; that in or about the month of November 1940, he brought said two hundred and forty-five bonds into the United States; that said bonds have been located in this country ever since that time; and that he has been, since June 1940, and still is the rightful owner and possessor of said bonds.

The complaint sets out portions of the 1953 Treaty and the Validation Law (texts of both of which are attached as exhibits to the complaint), and alleges that "each of paintiff's 245 debentures was and is a 'bond held abroad' within the requirement of Article 3 of the Validation Law, in that each of such debentures was 'located on January 1, 1945 outside the borders of Germany', viz., in the United States" (paragraph 17). Plaintiff states that he submitted the two hundred and forty-five debentures for validation by defendant-Validation Board (paragraph 18); and that, on March 26, 1956, the Validation Board rendered a decision denying validation (paragraph 19).

Plaintiff brings this action "to obtain a decision by this court that each of said 245 debentures was and is a 'bond held abroad' within the meaning of the Validation Law, and accordingly that the requirements for validation thereof have been met" (paragraph 22).

By notice filed August 8, 1956, plaintiff demanded a jury trial.

The three groups of defendants have filed separate answers.

The answer of the defendant-members of the Validation Board, filed July 25, 1956, denies that plaintiff was a good-faith purchaser and owner of the two hundred and forty-five debentures. It also denies that said debentures were, on January 1, 1945, "bond(s) held abroad" within the meaning of the Validation Law. The answer admits that

plaintiff submitted his debentures for registration and that the Validation Board denied validation on March 26, 1956. The answer denies that plaintiff is entitled to a *de novo* trial as is sought in this action.

Three affirmative defenses are interposed. The first defense is based on the legal theory that the decision of the Validation Board is *res judicata* and bars a re-trial of the issue whether plaintiff's debentures qualified for validation within the terms of the Validation Law. The second defense is predicated upon the legal proposition that "to the extent that plaintiff seeks in this action a determination by this Court of anything other than whether or not the hearing and other procedures required for the determination of the validity of the debentures have been had, this Court lacks jurisdiction of the subject-matter of the action."

The third defense also pleads lack of jurisdiction of the subject-matter of the action "to the extent that plaintiff seeks in this action a determination by this Court of anything other than whether there was substantial evidence to sustain the determination of the Validation Board that the said debentures were invalid."

The answer of the Steel Works, filed July 25, 1956, contains denials and admissions paralleling those in the Board's answer. In addition, three affirmative defenses are pleaded.

The first defense is that plaintiff's bonds had been reacquired by the issuer for amortization purposes; that they did not thereafter re-enter legitimate circulation; and that they were, therefore, invalid and not entitled to validation.

The second defense takes the position that "the review provided for by Article 33 of the said Validation Law is limited to a review of the proceedings before the Validation Board"; that the proceedings before the Board were regular in all respects; that the Board's decision "was supported by substantial evidence in the record before it"; and that plaintiff's debentures are not entitled to validation.

The third defense pleads lack of jurisdiction over the subject-matter of the action, except to determine whether the Board complied with all of the applicable procedural requirements and whether the Board's decision is supported by substantial evidence in its record.

The answer of Irving Trust Company, filed July 25, 1956, denies the material allegations of the complaint, except that it admits the plaintiff's registration of his bonds, the record facts of the Board's proceedings and its decision, and the existence of the Treaty and related legal provisions.

The answer of Dillon, Read & Co. contains denials and admissions paralleling those in the Irving Trust Company answer. In addition, it pleads three affirmative defenses. The first defense is that this defendant is not required by the Validation Law to make payment on the plaintiff's debentures, inasmuch as they have been denied validation. The second defense is that no funds were ever deposited with this defendant for the payment of plaintiff's bonds or of coupons attached thereto maturing subsequent to January 1, 1937. The third defense is that all funds deposited with this defendant pursuant to the trust indenture and not theretofore paid out were turned over to the Office of Alien Property of the United States Government on or about October 1, 1951.

*The Pending Motions*

By papers filed September 20, 1956, plaintiff made the following motions:

With respect to the answer of the Validation Board—Motion No. 1: To strike various paragraphs (7, 8 and 9) of the first defense on the ground of immateriality; to strike the entire first defense on the ground of legal insufficiency; and to strike paragraph 10 of the first defense on the ground that plaintiff is entitled—by virtue of the provisions of the Treaty and related laws and by virtue of due process of law —to have the issue of the validity of his bonds determined in proceedings before this Court "in the nature of a trial." Motion No. 2: To strike paragraph 11 of

the second defense on the ground of immateriality; to strike the entire second defense on the ground of legal insufficiency; and to strike paragraph 12 of the second defense on the ground that the proceedings before this Court "are not a mere review of the proceedings and/or decision of the Validation Board." Motion No. 3: To strike paragraph 13 of the third defense on the ground of immateriality; to strike the entire third defense on the ground of legal insufficiency; and to strike paragraph 14 of the third defense on the ground that plaintiff is entitled to have this Court do more than merely review the Board's proceedings and decision.

With respect to the answer of the Steel Works—Motion No. 1: To strike various paragraphs (10, 11, 13, 14 and 15) of the second defense on the ground of immateriality; to strike the entire second defense on the ground of legal insufficiency; and to strike paragraph 12 of the second defense on the ground that plaintiff is entitled—by virtue of the provisions of the Treaty and related laws and by virtue of due process of law—to have the issue of the validity of his bonds determined in proceedings before this Court "in the nature of a trial." Motion No. 2: To strike paragraph 16 of the third defense on the ground of immateriality; to strike the entire third defense on the ground of legal insufficiency; and to strike paragraph 17 of the third defense on the ground that plaintiff is entitled to a full judicial trial of the issue of validity.

Defendants have made the following two motions:

By papers filed August 15, 1956, the defendant-Validation Board members moved for summary judgment in defendants' favor and for a dismissal of the action. This motion is based upon the pleadings, the decision dated March 26, 1956 of the Validation Board, and the record of the entire proceedings had before the Board.

By papers filed September 14, 1956, the defendant-Steel Works moved to strike plaintiff's demand for a jury trial, upon the grounds that this is an action for equitable relief and that this is a statutory proceeding unknown to the common law.

All of the foregoing motions were argued extensively before the Court at a session set aside for such purpose.

I

Where the Validation Board has refused to validate a registrant's bonds, one of the remedial proceedings to which the bondholder may then resort is a proceeding in the United States courts for a full-scale judicial determination of the issue whether the plaintiff has met the requirements for validation of his bonds.[2] Such a proceeding is recognized by the terms of the Treaty and the Validation Law.

Article 33 of the Validation Law, entitled "Application to a Court of the Country of Offering," provides:

"(1) If, pursuant to the applicable foreign [American] law, the registrant [plaintiff] may apply to a court of the Country of Offering [United States] for a decision of the issue whether the requirements under this Law for validation by the Foreign Representative [Validation Board] of a registered bond have been met, Article 32 shall apply to the resulting decision if * * * *"

That the plaintiff may apply to a United States court for a decision of "the issue whether the requirements under this Law for validation by the Foreign Representative [Validation Board] of a registered bond have been met," refers to a judicial determination of the pri-

2. In its letter dated March 21, 1956, accompanying its decision, the Board advised plaintiff of his legal remedies with respect to its decision. Among the remedies thus described by the Board was the following:

*"Proceedings in a Court in the United States.* You may institute a proceeding in a Court in the United States to determine whether the requirements for validation of your bonds under the Validation Law have been met. * * *"

mary issue whether the *requirements* under the Validation Law have been met. In such proceeding, the "issue" before the Court is *not* whether the Validation Board's decision that the plaintiff has not met the requirements is sustained by the substantial evidence, but whether—on the basis of the evidence before the Court, independently considered—the plaintiff has met the requirements.

Article 24 of the Validation Law provides:

"(1) The registrant [plaintiff] has to prove the *requirements* for validation of the registered bond by the Foreign Representative [Validation Board]." (Emphasis supplied.)

Whether the plaintiff was able "to prove the *requirements* for validation" (Article 24) is to be equated with "the *issue* whether the requirements ＊ ＊ have been met" (Article 33). (Emphasis supplied.)

Article 27 of the Validation Law provides that the Validation Board shall validate the bond if the Board is satisfied that the bondholder "meets the *requirements* of Article 3(1) No. 1," i. e., that the bond is a "bond held abroad" in that it was "located on January 1, 1945, outside the borders of Germany as they existed on December 31, 1937" [Article 3(2); emphasis supplied]. Thus, the *issue* which the plaintiff has to meet and which the Validation Board must resolve, under Articles 24 and 27, is whether the bond registration and its supporting proof establish that the bond was located, on January 1, 1945, outside Germany.

Article 33(1), referring to a remedial United States court proceeding, provides —in language paraphrasing Article 27 (1)—that the court shall decide precisely the same substantive "issue," that is, whether the plaintiff's bonds were held outside Germany on January 1, 1945 [Article 3(1) No. 1].

In the cognate provision contained in Article III of the Treaty, members of the Validation Board waive diplomatic immunity from service of process issuing from courts in the United States "in proceedings brought *to determine whether the requirements for validation of bonds under the Validation Law have been met.*" (Emphasis supplied.) This broad-scope language of Article III of the Treaty is almost verbatim the same as the corresponding provision in Article 33(1) of the Validation Law. Neither the Treaty nor the Validation Law, in defining the *issue* to be decided by a United States court, narrows that issue to a mere determination of the question whether the Validation Board's decision of invalidity is supported by a substantiality of the evidence before that Board.

## II

That the United States court proceedings envisioned by Article III of the Treaty and Article 33 of the Validation Law were intended to be a plenary trial and an independent decision of the basic issue—whether the bonds were held outside Germany on January 1, 1945—is persuasively indicated by the cognate provisions of the Validation Law (Article 29) dealing with the alternative legal remedies available to a bondholder whose bonds have been declared invalid by the Validation Board. Under Article 29, if the bondholder does not apply to a United States court for a decision under Article 33, he may (in addition to applying to the Validation Board for a reconsideration of its decision) apply to either (1) the German court, known as the Chamber for the Settlement of Securities, or (2) a statutory arbitration board.

Under Article 31, "Application for Court Review," the plaintiff may apply to a German Court (Chamber for the Settlement of Securities) "for court review." Article 31 expressly provides that Article 22 (relating to proceedings before the Validation Board) applies *mutatis mutandis* to such application for German court review. This means that, in the German court review proceedings, as in the Validation Board proceedings, "*the facts relevant for the registration* shall be set forth together with an indication or submission of the evidence" (Article 22; emphasis supplied). In addition, the issuer, the trustees and the paying

agents of the bonds must be given "an opportunity to make a statement and to submit evidence." Article 31 then provides:

"In all other respects, the provisions concerning the proceedings before the Foreign Representative [Validation Board] shall apply mutatis mutandis to the procedure."

The foregoing provisions make it abundantly clear that the proceedings before the German court are not confined to the record of evidence adduced before the Validation Board but, on the contrary, the German court has the power to conduct a virtually *de novo* hearing of the evidence and to engage in a full-scale, independent consideration and evaluation of that evidence.

Article 31 contains the following highly significant provision:

"If the Chamber *finds* that *the application* of the registrant [bondholder] is *justified*, it shall render *a decision holding that the requirements for validation* under this Law have been met." (Emphasis supplied.)

The quoted language means that the German court renders a decision expressing its own independent finding on the primary issue whether the bondholder's application, *setting forth the relevant facts and evidence* (Article 22), is "justified"; and the "holding" of its decision is that the requirements for validation have been met.

We now turn to a consideration of the legal remedy of arbitration. Under Article 34, the parties may resort to proceedings "in arbitration." In such proceedings, the arbitration board may "review"

the Validation Board's decision (Article 35). According to Article 35, "the arbitration boards may establish their own procedure, applying Article 31 mutatis mutandis," that is, the procedure used by the German court. Under Article 6 of the Agreement on Validation Procedures, the Validation Board must transmit to the Arbitration Board its file concerning the bonds involved, and *"The Arbitration Board may take such evidence as it deems necessary."* (Emphasis supplied.) Thus, the arbitration board, like the German court, is authorized to conduct a virtually *de novo* proceeding, hearing the evidence and determining whether "the application of the registrant is justified," in which event it renders a decision "holding that the requirements for validation under this Law have been met." The arbitration board is not restricted to the record of evidence developed before the Validation Board.

There is no reason of policy, logic or language which warrants the view that the proceedings in a court of the United States should be substantially narrower in scope than the proceedings in a German court or before an arbitration board. These three proceedings are made coordinate and alternative legal remedies (Article 29).[3] They should be so interpreted by this Court.

The nature of the proceedings before the German courts and arbitration boards thus furnish a meaningful frame of reference within which to view the scope of the cognate proceedings in a United States Court. Our conclusion is that these coordinate and alternative legal remedies should be interpreted as providing for a full-scale, independent

---

3. Upon the oral argument, there was submitted to the Court an eleven-page press release issued by the Department of State (February 26, 1953, No. 108) on the subject of "The Validation of German Dollar Bonds." The release quotes the text of the "Agreement on Validation Procedures" at pages 2 to 8. Under the heading "Background Information," the release describes (pp. 9–11) the genesis and provisions of the Validation Law of

August 25, 1952. At page 10, the following appears:

"Where the Validation Board denies validation, the bondholder may at his election file an appeal either with a special Arbitration Board which is established in the United States, or with the German courts or with the United States Courts. In these cases, the Validation Board will retain possession or control over the affected bonds pending the outcome of the appeal."

hearing before a German court, an arbitration board or a United States court, as the case may be.

### III

Defendants' argument that the use of the past tense in the words "have been met" in Article 31(4) and Article 33(1) is evidence that the review by the German and United States courts should be limited to an examination of the record of the Validation Board's proceedings. This argument overlooks the fact that the same expression, "have been met," is also used in Article 28(1), dealing with the proceedings before the Validation Board:

> " * * * the Foreign Representative [Validation Board] shall deny the validation * * * if he [it] is not satisfied * * * that the requirements for a validation by him [it] *have been met.*" (Emphasis supplied.)

### IV

The Validation Law uses the word "review" in the literal and generic sense of a "second hearing." That word is to be treated as a broad juridical term and not as a word of art peculiar to American administrative law. The Validation Law, unlike the Treaty, was intended for use by the nationals of a number of different countries, not only of the United States. The Validation Law promulgated by the German Government, was designed for use in diverse legal systems. It was not enacted with the particular aspects of American administrative law in mind. Nor was it intended for use exclusively in the courts of the United States. Necessarily flexible language was employed. The word "review," as used in the Validation Law, must, therefore, be given a cosmopolitan and not an endemic meaning.

### V

In reaching the conclusion that the Treaty (Article III) and the Validation Law (Article 33) call for a plenary judicial hearing, the Court has adopted a view which differs with the defendants' interpretation of the following language: "the issue whether the requirements under this Law for validation by Foreign Representative [Validation Board] of a registered bond have been met."

If, *arguendo*, the Court were to adopt the defendants' interpretation of that language as used in the first proviso of Article 33 of the Validation Law, the Court would reach the same conclusion as that already expressed. Let us assume, as defendants argue, that the language in the first proviso of Article 33 means that, under applicable American administrative law, the plaintiff may apply to a United States Court for a decision of the issue whether the determination of invalidity by the Validation Board is supported by substantial evidence. If the first proviso of Article 33 (1) is thus satisfied, the *second* proviso contained in Article 33(1)—items "1" to "4" of Article 33(1)—then becomes operative.[4]

Under the express terms of items "1" to "4" (the second proviso) of Article 33 (1), the proceeding must be directed against the issuer "as a party in inter-

---

4. The first proviso of Article 33(1) reads:
   "(1) *If,* pursuant to the applicable foreign [United States] law, the registrant may apply to a court of the Country of Offering [United States] for a decision of the issue whether the requirements under this Law for validation by the Foreign Representative [Validation Board] of a registered bond have been met, * * *" (Emphasis supplied.)
   The second proviso of Article 33(1) immediately follows the above language and reads:
   " * * * Article 32 shall apply to the resulting decision *if*

1. the application to such court has been made within the periods set forth in Article 31(2), first sentence;
2. the proceeding has been directed against the issuer as a party in interest;
3. the issuer as well as the trustees and paying agents have been given an opportunity to make a statement and to submit evidence; and
4. Article 24(1) concerning the registrant's burden of proof has been applied at least mutatis mutandis." (Emphasis supplied.)

est"; the issuer, the trustees and the paying agents must be given an opportunity "to make a statement and to submit evidence"; and the plaintiff-bondholder has the "burden of proof." It necessarily follows that plaintiff-bondholder has the right to submit counter-evidence. The joint effect of the foregoing provisions is to provide for a plenary judicial hearing.

Article 33(3) expressly provides that, in a case coming within Article 33(1), neither the Validation Board nor the issuer may object "to the exercise of jurisdiction by the courts of the Country of Offering," that is, the United States.

### VI

If both of the provisos in Article 33(1) —the two "if" clauses—have been satisfied, "Article 32 shall apply to the resulting decision." Article 32 applies the effect of a German court decision to a decision of a United States court. Article 32 is the bridge which makes clear the precise analogy of the German court proceedings to proceedings in a United States court. Article 32 declares that, if the decision [of the German Chamber for the Settlement of Securities] "holds" that the requirements for validation of the bond have been met, the Validation Board must issue a validation certificate. If the decision holds that the requirements for validation have not been met, the prior decision of the Validation Board denying the validation becomes binding as soon as the court decision becomes final.

The foregoing is additional evidence that the proceedings in a United States court are to be treated substantially the same as German court proceedings.

The conclusion is that proceedings under Article 33, such as the present action, require the Court to make an independent evaluation of the evidence to be adduced in a plenary judicial hearing.

Accordingly, plaintiff's motion addressed to the first, second and third de-

fenses of the defendant-Validation Board, and to the second and third affirmative defenses of the defendant-issuer, are granted. The motion by defendant-Validation Board, for summary judgment, is denied.

Since the plaintiff is entitled to a full judicial trial, the fact that the Validation Board's decision may be supported [5] by substantial evidence is not controlling.

### VII

The remaining question is whether plaintiff is entitled to a jury trial. Plaintiff has demanded a trial by jury of the specific issue raised in paragraph 22 of the complaint, viz., whether his two hundred and forty-five debentures were bonds held outside Germany on January 1, 1945. The defendant-issuer has moved to strike the demand for jury trial on the ground that the action is equitable in nature and unknown to the common law.

According to the complaint herein (paragraph 1), "this action arises under a treaty of the United States of America with the Federal Republic of Germany relating to the validation of German Dollar Bonds, * * *." The complaint attaches and quotes from the Treaty and the related laws and agreements (Exhibits A and B, attached to the complaint). The prayer for relief asks for a determination that the requirements for validation of plaintiff's two hundred and forty-five bonds have been met and for an order directing the Validation Board to validate plaintiff's two hundred and forty-five bonds.

The Seventh Amendment to the Constitution preserves the right of trial by jury "in Suits at common law, * *." F.R.Civ.P.Rule 38(a), 28 U.S.C.A. preserves to the parties inviolate "the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States."

---

5. The Court's analysis of the Validation Board's record makes it clear that the Board's decision was amply justified by the substantial evidence, considering the record as a whole; and that the requirements of due process were satisfied.

The action at bar is not "a suit at common law." It arises under and is expressly based upon the Treaty and related legislation. It is one of the remedies explicitly provided for by the provisions of the Validation Law (Articles 29 and 33). As a matter of formal classification, the present proceedings may be designated as a statutory action in equity.[6] Consequently, plaintiff is not entitled to a jury trial as of right. Defendant-Steel Works' motion to strike plaintiff's jury demand is granted.

Settle orders on notice.

### APPENDIX

Plaintiff registered his two hundred and forty-five bonds with the Validation Board on September 18, 1953. He sought to prove that the debentures qualified for validation as "bonds held abroad" on January 1, 1945.

The registration was supported by an affidavit of Juan F. Funes, Consul General of Honduras, dated September 14, 1953. Mr. Funes' affidavit stated that he had held the debentures from September 1942 to December 1950 for plaintiff.

The German Examining Agency objected to validation. Upon notification thereof by the Board, plaintiff submitted his own affidavit, stating that he had acquired the bonds in Warsaw, Poland, in June 1940, before fleeing that country, and that he had brought them to the United States in November 1940. Plaintiff also submitted an additional affidavit by Mr. Funes, an affidavit by one Alexander Gross, and correspondence indicating that plaintiff had tried unsuccessfully to obtain bank records concerning acquisition of the debentures in Poland.

The Board held a hearing on May 11 and 12, 1955. Plaintiff, Mr. Funes and Mr. Gross testified. Plaintiff subsequently submitted an affidavit of his wife.

The opposing evidence consisted of: eleven affidavits submitted by the issuer; one affidavit obtained by the Board; minutes covering interviews of fourteen witnesses, conducted personally by the Board members in Germany (these minutes were signed by the witnesses); and certain reports, letters, memoranda and other information acquired by the Board.

In the course of its independent investigation, the Board was unable to obtain, either in the United States or Germany, any information which would substantiate plaintiff's application.

The Board concluded that plaintiff's debentures had been "on January 1, 1945 located in the vaults of the Reichsbank in Berlin and had been reacquired by the issuer" (Decision, p. 2).

In appraising the probative value of Mr. Abrey's evidence, at points where checking was possible, the Board discovered fundamental inconsistencies in his story concerning his continued control and possession of the bonds. In the Board's judgment, there was grave doubt as to plaintiff's credibility. The critical flaws in plaintiff's story are described at

---

6. See United States v. Morgan, 1939, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211; National Labor Relations Board v. Jones & Laughlin, 1937, 301 U.S. 1, 48–49, 57 S.Ct. 615, 81 L.Ed. 893.

The decisions cited by plaintiff in support of a jury trial are sharply distinguishable from the present case. Ring v. Spina, 2 Cir., 1948, 166 F.2d 546, allowed a jury trial in a treble damage action in which injunctive relief was also requested. Southern Railway Company v. City of Greenwood, D.C.W.D.S.C. 1928, 40 F.2d 679, required a jury's decision on a trial of title to realty before determining the applicability of injunctive relief. Nor are American Lumbermen's Mutual Casualty Company v. Timms & Howard, 2 Cir., 1939, 108 F.2d 497, and Pacific Indemnity Company v. McDonald, D.C.Or.1938, 25 F.Supp. 522, applicable. The former case allowed a jury trial in a declaratory judgment action by an insurance company for an adjudication of non-liability because the accident involved was outside the policy coverage. The latter case allowed a jury trial in an action for rescission of an insurance policy on the ground of fraud.

State of South Carolina v. Gaillard, 1879, 101 U.S. 433, 25 L.Ed. 937, illustrates the point that a jury trial may be expressly required in a statutory scheme designed for purposes similar to those in the present case.

pages 17–18 of the Board's twenty-one page decision (attached to the Board's motion for summary judgment).

In the affidavit (p. 8) submitted by plaintiff on his own behalf (Document 3 of the record before the Validation Board), he stated that, after arriving in this country in 1940, he had for a time kept the debentures in his safe deposit box at the Chemical Bank in New York City. He reaffirmed this on direct examination at the hearing (transcript of record, pp. 11, 12). On cross-examination, he stated that he had taken them out of the box for a time in 1941, took them home, and then had them returned to the box by his wife (transcript of record, pp. 59–62).

The Board subsequently discovered that plaintiff's safe deposit box at the Chemical Bank was of such measurements that it was impossible for the box physically to have held the registered debentures (Documents 40, 41). The Board also discovered that the box had been blocked by the Treasury; and that, on the only two occasions when plaintiff had had access to the box (including the time when he surrendered it), no securities of any kind had been removed from it (Documents 38, 39).

When informed of the above facts, plaintiff submitted an affidavit by his wife. She swore that, although she had been told to return the debentures to the box, she had, instead, placed them in her "lingerie drawer," and that, when she was subsequently asked to take them out of the box again, she acted in such fashion as to lead plaintiff into thinking that she had removed them from the box (Document 7). This statement did not explain either how plaintiff could have withdrawn the debentures in the first place from the too-small box, or could have expected his wife to return them to it. He must have remembered at that time the size of his safe deposit box.

The same difficulty arises from the affidavits of Mr. Funes. Mr. Funes first swore, on September 14, 1953, that he had held the debentures from 1942 to 1950 for plaintiff (Document 1). In his second affidavit (Document 2), sworn to June 18, 1954, Mr. Funes retreated from his prior statement "that continuously from September 1942 until September 1950, the bonds enumerated on the attached schedule were in and under my custody," and, Mr. Funes said, that plaintiff had visited him and brought with him a package "containing, as he told me, German bonds."

Later, on cross-examination at the hearing, Mr. Funes admitted that he had sworn to the first statement only because of his trust in and friendship for plaintiff, and that, although he had held a package for plaintiff which plaintiff had said contained German bonds, he had no personal knowledge of its contents (transcript of record, pp. 138–140).

Plaintiff admitted, at the hearing, that he had failed to list the debentures in documents prepared for the Immigration and Naturalization Service, despite instructions to list all his assets, although he alleged that he was carrying them with him when he entered the United States (transcript of record, pp. 85).

Plaintiff similarly did not list the bonds on an official report of assets, sworn to by him on October 29, 1941, and presented, as required, to the United States Treasury Department (Document 35, p. 4). The latter report specifically called for information as to "Foreign Securities held in the United States."

Plaintiff did not limit his self-contradicting sworn statements to those filed with the United States Government authorities. Thus, he admitted, on cross-examination (transcript of record, p. 70), that the statement in his affidavit to the Validation Board (Document 3, p. 11)—that he had kept these debentures in a safe in his home in Great Neck from the time, in 1950, when they had allegedly been returned by Mr. Funes, until he submitted them for validation—was incorrect. In trying to explain away the detailed description contained in his affidavit as to how he had placed the debentures in "a Mosler safe" constructed in his home, in the light of his subsequent discovery that "the Mosler safe"

was too small to hold the debentures, plaintiff said (transcript of record, pp. 69, 70):

"Well, the wall safe turned out to be too small even to accommodate these papers. * * * That is incorrect in the affidavit, sir, I did not know that we will go into such details. * * *"

In dealing with the various inconsistencies in plaintiff's testimony the Board, in its written decision, stated (Decision, p. 18):

"The record of admittedly false sworn statements to the United States Government and of successive changes of testimony when confronted with discrepancies at points where such testimony could be checked can hardly be explained as honest mistakes due to the lapse of years blurring the detail of transactions in the registrant's memory. The Board has concluded that on the basis of the registrant's case alone there is ample reason ' * * * to doubt that the statements made by the registrant in his registration are true.' (Article 4(6) Second Implementing Ordinance). The Board cannot, on this record of false and shifting testimony, rely on the veracity of Mr. Abrey.

"In addition, there is substantial affirmative evidence contradicting or throwing doubt on Mr. Abrey's claims. * * *"

Opposed to plaintiff's evidence was a solid body of proof consisting of affidavits, signed statements obtained in Germany by the Board members themselves, and documentary and other evidence that the debentures registered by plaintiff had, in fact, been in the vaults of the Reichsbank on March 20, 1941, and that they had remained there until some time after May 8, 1945 (Decision, p. 18).

The most persuasive single piece of evidence against plaintiff was the affidavit of William T. Pagen, Assistant Vice President of the Irving Trust Company, One Wall Street, New York City, sworn to July 19, 1955 (Document 20). The Pagen affidavit authenticated a letter of Konversionskasse für deutsche Auslandsschulden (Conversion Office for German Foreign Debts) to Irving Trust Company, dated March 20, 1941 and stamped as received by the Irving Trust Company on April 29, 1941, with an annexed list of debentures of defendant-Steel Works —setting forth the very numbers of the bonds now held by plaintiff and stating that these particular bonds were at that time actually held in a German bank in Berlin.

As a consequence of its preliminary determination to deny validation, the Board notified plaintiff on July 27, 1955 of its tentative decision, as well as of all the detailed facts and evidence opposing validation (Document P 56). The Board afforded him the three-month period within which to refute such facts and evidence. It offered to aid plaintiff in any way within its power (Document P 56).

Plaintiff did not submit further evidence, either during the three-month period or during an additional period expiring November 16, 1955, which was granted at his request (Document P 63).

When plaintiff's counsel questioned the veracity of witnesses in Germany, the Board, in a letter dated November 15, 1955, offered plaintiff the opportunity to examine those witnesses in Germany (Document P 67). This was declined (Document P 68).

Plaintiff's counsel indicated that he believed that the decision of the Board should be reviewed by a trial de novo in a court in the United States.

The Board advised plaintiff's counsel on December 8, 1955, that it took the position that review would be limited to the record of the Board's proceedings (Document P 69). At the same time, the Board reaffirmed its offer as to the witnesses in Germany.

Plaintiff's counsel, on December 19, 1955, reaffirmed his rejection of the Board's offer and his position on the question of review (Document P 70).

The Board thereupon closed its record of proceedings.

### Supplemental Opinion

The Court: The motion of defendant Steel Works for reargument is granted. Upon such reargument the Court adheres to its original decision, dated March 26, 1957. In reality this motion for reargument seeks clarification of the Court's opinion "on one narrow point," as stated in the moving affidavit of Mr. Charles C. Parlin, Jr.

That a trial in the United States District Court under the treaty and related laws should be analogized to the coordinate remedial proceedings before the German court and arbitration boards in respect of the power (1) to obtain and consider any and all relevant evidence de novo and (2) to decide the primary issue as to the merits of the total evidence independently considered is not to be taken to mean that the three procedures are to be equated with each other. They are analogues but only analogues. They have importantly similar but not identical attributes.

The Court's decision means that the opinion and record of the Validation Board may not be considered as substantive proof or evidence with respect to the factual issues to be tried before the Court at the plenary de novo trial of this action.

The statement that the Court shall conduct an independent trial means that the parties shall present their evidence before the trial court in accordance with the ordinary rules of evidence applicable to regular judicial trials in the District Court. As a general proposition, it may be stated that witnesses' statements, depositions and affidavits submitted to or obtained by the Validation Board do not constitute admissible evidence of the facts contained in such statements, depositions and affidavits.

However, such statements, depositions and affidavits may be used, in accordance with the ordinary rules of evidence, to refresh a witness' recollection or to contradict a witness by showing prior inconsistent statements or the defendants could introduce into evidence the statements contained in plaintiff Abrey's own affidavits as admissions against interest.

Plaintiff's informal request with respect to the Court's statements concerning the Validation Board's proceedings and evidence adduced before that Board (Appendix to Court's decision of March 26, 1957) is denied. The Court's statements were designed (1) to indicate the lack of merit of plaintiff's contention that plaintiff's "due process" rights had not been fully recognized or safeguarded; and (2) to express this Court's view that the Validation Board's record demonstrates convincingly, in point of fact and of law, that there were a substantiality of evidence and regularity of jurisdiction and procedure so far as concerns the Board's proceedings and decision. Consequently, if the Court of Appeals should determine that this Court erred in its decision with respect to the scope of "review," this Court sought to eliminate the possible necessity of having the case remanded to the District Court for the purpose of then determining for the first time the question whether the Board's administrative decision and proceedings were supported by a substantiality of evidence and regularity of jurisdiction and procedure.

The Court's summary of the proceedings and the evidence before the Validation Board was not intended as findings of fact binding on the trial court, nor is such summary admissible as evidence of the facts therein recited. The trial court's judgment and discretion with respect to rulings on questions of evidence upon the trial are not to be deemed circumscribed by this Court's original decision and this supplemental opinion.