KNUTE C. ENGEN, APPELLEE AND CROSS-APPELLEE, V. UNION STATE BANK OF HARVARD ET AL., APPELLEES AND CROSS-APPELLEES: VAN E. PETERSON, RECEIVER, ET AL., APPELLEES AND CROSS-APPELLANTS: FIRST TRUST COMPANY OF LINCOLN, APPELLANT AND CROSS-APPELLEE.

FILED FEBRUARY 21, 1929. No. 26236.\*

\* Note—Nos. 26673, 26713, 26719, reported in vol. 117, pp. 804, 805, 809; opinions by Thompson, J., filed February 21, 1929.

*Hall, Cline & Williams,* for appellant.

*Hainer, Craft, Edgerton & Fraizer, H. G. Wellensiek, J. H. Grosvenor, Butler & James* and *Brown, Baxter, Van Dusen & Ryan, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON AND EBERLY, JJ., and REDICK, District Judge.

EBERLY, J.

This is primarily a suit to cancel deeds made by Christian Knudson in his lifetime conveying to his two nieces, Anna S. Brown and Bertha M. Megrue and husbands, respectively, eighty-acre tracts in Hamilton county, Nebraska.

The pleadings embrace other issues, however, but the finding of the trial court was such as rendered the validity of the deeds, above referred to, the controlling question.

The undisputed facts in the record appear to be that Christian Knudson, a son of Norwegian subjects, was born in Norway, January 10, 1845, and married Mari Tollefsen

Todok, also a subject of Norway, at a church wedding in that country; that thereafter they lived together in Norway until the spring of 1868. Knudson and his brother, Eric Engen, left their home in Norway, May 16, 1868, and arrived in Wisconsin, June 22, 1868. Knudson came to Nebraska in 1878. His wife, Mari Tollefsen Todok, and his child remained at their home in Norway. The wife never came to the United States and at all times has continued a resident and subject of Norway. There is no evidence in the record that the naturalization of Christian Knudson as a citizen of the United States was ever completed. The plaintiff in this action, Knute C. Engen, the son of Christian Knudson and Mari Tollefsen Todok, left the Norway home and came to Nebraska in 1893, when he was 23 years old. He then worked for his father about one year on the father's place after his arrival and then permanently left his father's residence. The mother of Knudson was born June 16, 1818, and his father was born February 3, 1819. His mother came to Nebraska in 1886 and the father in 1887 and joined Knudson who was then living on the 160 acres in controversy. Knudson took care of the old folks and supplied the provisions for them. Knudson's father died in this home January 31, 1900, being 81 years old; the mother died April 8, 1906, being 88 years old.

There is no evidence in the record that either the father or mother of Knudson was a naturalized citizen of the United States. On July 17, 1923, Christian Knudson in consideration of the care that his niece and her husband rendered to him, deeded the north half of the southwest quarter of section 35, township 9, range 7, Hamilton county, to Bertha M. Megrue and Leroy A. Megrue. On October 2, 1923, the Megrues deeded this land to the Union State Bank of Harvard for a consideration of $9,600, and the Union State Bank conveyed in turn to Theodore Griess, its president, who on September 22, 1924, borrowed from the First Trust Company of Lincoln $4,500, and executed a mortgage upon this land to secure the same to that organization. On July 17, 1923, Christian Knudson, in consid-

eration of the care rendered by his niece and her husband also deeded the south half of the northwest quarter of section 35, township 9, range 7, Hamilton county, to Anna S. Brown and Robert E. Brown. On September 17, 1923, the Browns deeded the premises thus received to the Union State Bank of Harvard for a consideration of $8,000. This bank in turn deeded to Theodore Griess, who borrowed from the First Trust Company of Lincoln $5,000, and executed a mortgage to secure the same on September 22, 1924, to such trust company.

The district court by special findings determined, in addition to certain other facts, that Christian Knudson, sometimes known as Christian Engen, was at all times an alien and a subject of Norway, having never completed his naturalization in the United States, and that the defendant and cross-petitioner, Mari Tollefsen Todok, was his legal wife and was living in Norway at the time of his death; that Christian Knudson settled in Nebraska in 1878 and established a homestead which embraced the premises in controversy, and continued to reside upon said real estate as his homestead until his death, August 6, 1923; that the warranty deeds to the Megrues and the Browns referred to were each void and without force and effect for the sole reason that the lands purporting to be conveyed thereby were a part of the homestead of said Christian Knudson, and these deeds were not signed and acknowledged by his wife, the defendant, Mari Tollefsen Todok, and were therefore void. The court further determined that the conveyances made by the Megrues and Browns of the title thus received by them to the Union State Bank of Harvard were likewise null and void and of no force and effect for the sole reason that none of the grantors, due to the invalidity of the deeds as determined, had title to said real estate, and that the title thereof remained and continued to be vested in Christian Knudson, and that on August 6, 1923, when he died intestate leaving as his sole and only heirs at law his wife, the defendant, Mari Tollefsen Todok, and his son, the plaintiff, Knute C. Engen, the fee title to such real

estate descended and vested in them, half and half, share and share alike; and the court further found expressly that there was no fraud, conspiracy, or undue influence exercised by the defendants, or their agents, on said Christian Knudson, as alleged in plaintiff's petition. The decree was entered accordingly. Van E. Peterson, receiver of the Union State Bank of Harvard, Nebraska State Bank of Harvard, and First Trust Company of Lincoln appeal.

A careful consideration of the evidence contained in the record inclines us to the belief, consistent with the findings of the trial court who heard the evidence and observed the witnesses who testified in person before him, that there was no fraud, conspiracy, or undue influence exercised by the defendants, or their agents, on Christian Knudson concerning, or in connection with, the conveyances of the premises involved in this litigation to the defendants Browns and the defendants Megrues. We further agree with the district court that the evidence sustains the conclusion that Knudson, the deceased, was at all times a subject of Norway and not a citizen of the United States.

"Foreigners by birth are presumed to be aliens. The status of a person as to alienage, when once established, is presumed to continue until the contrary is proved." 2 C. J. 1045, sec. 4; *Hauenstein v. Lynham,* 100 U. S. 483.

The mere fact of long residence in this country is insufficient to overcome this presumption. *Ehrlich v. Weber,* 114 Tenn. 711.

In addition, the evidence of the record before us, though somewhat meager on this point, tends to support the same conclusion. We have before us for determination, therefore, the question of rights wholly derived from a subject of Norway, and who was an alien both at the time of the execution of the conveyances questioned and at the time of his death.

As to the situation thus presented, this court is committed to the view that the sixth article of the treaty of 1783 with Sweden incorporated by reference in the treaty of 1827 with Sweden and Norway, and which as to Norway

still is in force, is controlling. The doctrine announced by this court in *Erickson v. Carlson* 95 Neb. 182, is as follows:

"The French words *'fonds et biens,'* translated as 'goods and effects,' include reality, as they appear in the following terms of a treaty between the United States and Sweden: 'The subjects of the contracting parties in the respective states may freely dispose of their goods and effects, either by testament, donation, or otherwise, in favor of such persons as they think proper; and their heirs, in whatever place they shall reside, shall receive the succession even *ab intestato*, either in person or by their attorney.' 8 U. S. St. at Large, p. 64, art. VI.

"Treaty rights of nonresident aliens must be enforced by state courts without regard to conflicting statutory provisions." *Erickson v. Carlson*, 95 Neb. 182. See *Butschkowski v. Brecks*, 94 Neb. 532.

In other words, the accepted doctrine of the court is:

"Under section 2, art. VI, Constitution of the United States, 'all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby; anything in the Constitution or laws of any state to the contrary, notwithstanding.'

"State courts will take judicial notice of the existence of a treaty, and if its provisions are self-executing it is unnecessary to plead its existence." *Butschkowski v. Brecks*, 94 Neb. 532. See, also, *Goos v. Brocks*, 117 Neb. 750.

To what extent, if any, is the claim of homestead in the property in controversy made on behalf of Mari Tollefsen Todok sustained and supported by the words quoted. These treaty provisions, referred to, date from 1783.

Homestead laws are strictly of American origin. The earliest statute of this kind was that enacted by the Republic of Texas, January 26, 1839. The first constitutional guaranty of homestead exemption was that of the Constitution of Texas in 1845. This was followed in turn by Vermont in 1849. All other states of the American Union

adopted this policy at a date subsequent to 1849. In view of the history of the development and adoption of this public policy, it can hardly be inferred that the question of homestead rights were in contemplation of the makers of the treaty of 1783. True, the thirteen American states which then formed the Confederacy had each substantially adopted, for the benefit of the wife, the English doctrine of dower as defined at common law. Even so, it is, and was, an established doctrine of the common law that "dower rights are cast upon the widow by operation of law, and it is a well-settled common-law rule that an alien cannot cast any dower rights upon his wife, nor can an alien widow of a citizen take by dower any interest in her husband's lands." 2 C. J. 1066, sec. 32.

An examination of the terms of the treaty before us discloses no intention to extend the benefits of common-law dower to the wife of the alien; in fact no provision therein contained discloses any purpose to create or provide for her benefit any special rights or privileges whatever because of, or based upon, a marital relation sustained to an alien owner of property. On the contrary, this instrument expressly stipulates for conferring upon the "subjects of the contracting parties in the respective states" the unlimited, unrestricted, and unqualified right to "freely dispose of their goods and effects *("fonds et biens")*, either by testament, donation, or otherwise (which necessarily includes the right to convey by deed), in favor of such persons as they think proper." This, in legal effect, is wholly inconsistent with the right of dower, and, in like manner, inconsistent with the existence of statutory right of homestead, in real estate to which the treaty applies.

For, if we consider the provisions of section 2819 and section 2832, Comp. St. 1922, as applicable to the subject of the present action, it necessarily follows that certain property within the purview of the treaty before us "cannot be conveyed * * * unless the instrument by which it is conveyed * * * is executed and acknowledged by both husband and wife;" and also that such property (home-

stead) "vests on the death of the person from whose property it was selected, in the survivor, for life, and afterwards in the decedent's heirs forever, subject to the power of the decedent to dispose of the same, except the life estate of the survivor, by will."

The statutory provisions referred to thus assume the nature of limitations, qualifications, or modifications of the treaty itself, and, if valid, would necessarily change its true construction. Each of these provisions of the legislative enactment must therefore be considered to be *pro tanto* inconsistent with the terms of the controlling treaty properly construed. The conclusion follows that, to the extent inconsistent with the terms of the treaty, the statutory provisions are inoperative. The unquestioned rule of construction requires that the provisions of the treaty must be liberally construed and given full force and effect "anything in the Constitution or laws of any state to the contrary, notwithstanding." Therefore, the legal effect of the conveyances executed by Christian Knudson must be determined wholly by the powers conferred on him by treaty, and not by the inconsistent limitations and restrictions prescribed in the Nebraska homestead act. So considered, the validity of these conveyances cannot be questioned and they were each effective in vesting the titles to the lands described therein to the grantees therein named. These instruments being valid, it also follows that the subsequent deeds and mortgages affecting the titles, which were, in the district court, decreed to be void, are likewise valid and effective.

The judgment is therefore reversed and the cause remanded, with instructions to the district court to enter a decree dismissing the petition of plaintiff and the cross-petition of the defendant, Mari Tollefsen Todok, and adjudging each and all of the mortgages and conveyances in suit valid and enforceable.

REVERSED.

THOMPSON, J., dissents.