TODOK ET AL. *v.* UNION STATE BANK OF HARVARD, NEBRASKA, ET. AL.

No. 412. Argued April 22, 1930.—Decided May 19, 1930.

*Mr. Frank E. Edgerton,* with whom *Messrs. H. G. Wellensiek, C: C. Fraizer,* and *Norris Brown* were on the brief, for petitioners.

*Mr. Walter D. James,* with whom *Messrs. Benjamin F. Butler, Earl M. Cline,* and *Frank D. Williams* were on the brief, for respondents.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Christian Knudson, a native and citizen of Norway, came to this country in 1868 and settled in Nebraska in 1878. He was never naturalized. He established a homestead on 160 acres of land in Hamilton County, Nebraska, and resided there until he died intestate in August, 1923. His father and mother made their home with him until their death, and his son Knute C. Engen, who came to Nebraska in 1893, also lived with him for a time. The wife of Knudson remained in Norway. In July, 1923, Knudson executed deeds of the homestead to his nieces

and their husbands, and these grantees conveyed the property to the Union State Bank of Harvard, Nebraska.

This suit was brought by the son of Knudson, Knute C. Engen, in the District Court of Hamilton County to cancel the conveyances of the land upon the ground that they were obtained by fraud. The widow of Knudson, Mari Tollefsen Todok, who had not joined in the deeds, was made a defendant. By her cross petition she attacked the conveyances, alleging that the property constituted a homestead in which she had an undivided one-half interest. The other defendants answered her cross petition, and in her reply she set up the right to take the real estate of her deceased husband by virtue of the treaty of amity and commerce between the United States and Norway.

The District Court determined that no fraud had been practiced in obtaining the deeds from Knudson, but that these, and the later conveyances dependent upon them, were void upon the ground that the land was homestead property the title to which remained in Knudson until his death and then descended to his widow and his son. The Supreme Court of the State sustained the decision of the District Court with respect to the issue of fraud, but reversed the judgment upon the ground that, under the treaty with Norway, Knudson was entitled to convey the property and that his grantees took title under his deeds. *Engen v. Union State Bank,* 118 Neb. 105. This Court granted a writ of certiorari, 280 U. S. 546.

We are not called upon to decide as to the validity under the homestead law of Nebraska of a deed of the homestead by the husband when the wife is an alien who has never come to this country and made the homestead her home. We accept the decision of the Supreme Court of the State that, aside from the effect of the treaty, Knudson's conveyances were void under the law of the State. That Court, referring to the statutes of Nebraska

as to homestead property, and their application to the present case, said (118 Neb. 111, 112):

"For, if we consider the provisions of section 2819 and section 2832, Comp. St. 1922, as applicable to the subject of the present action, it necessarily follows that certain property within the purview of the treaty before us ' cannot be conveyed . . . unless the instrument by which it is conveyed . . . is executed and acknowledged by both husband and wife,' and also that such property (homestead) ' vests on the death of the person from whose property it was selected, in the survivor, for life, and afterwards in decedent's heirs forever, subject to the power of the decedent to dispose of the same, except the life estate of the survivor, by will.'

"The statutory provisions referred to thus assume the nature of limitations, qualifications, or modifications of the treaty itself, and, if valid, would necessarily change its true construction. Each of these provisions of the legislative enactment must therefore be considered to be *pro tanto* inconsistent with the terms of the controlling treaty properly construed. The conclusion follows that, to the extent inconsistent with the terms of the treaty, the statutory provisions are inoperative. The unquestioned rule of construction requires that the provisions of the treaty must be liberally construed and given full force and effect ' anything in the Constitution or laws of any state to the contrary, notwithstanding.' Therefore, the legal effect of the conveyances executed by Christian Knudson must be determined wholly by the powers conferred on him by treaty, and not by the inconsistent limitations and restrictions prescribed in the Nebraska Homestead Act."

The only question before us is as to the construction of the treaty. The provision invoked is Article 6 of the treaty with Sweden of April 3, 1783 (8 Stat. 60, 64), revived by the treaty with Sweden and Norway of Sep-

tember 4, 1816 (8 Stat. 232, 240) which was replaced by the treaty with Sweden and Norway of July 4, 1827 (8 Stat. 346, 354) now in force with Norway (Sen. Doc., 61st Cong., 2d sess., No. 357, vol. 48 (2 Malloy), p. 1300). This article is as follows:

"The subjects of the contracting parties in the respective States, may freely dispose of their goods and effects either by testament, donation or otherwise, in favour of such persons as they think proper; and their heirs in whatever place they shall reside, shall receive the succession even *ab intestato,* either in person or by their attorney, without having occasion to take out letters of naturalization. These inheritances, as well as the capitals and effects, which the subjects of the two parties, in changing their dwelling, shall be desirous of removing from the place of their abode, shall be exempted from all duty called '*droit de detraction*' on the part of the government of the two States respectively. But it is at the same time agreed, that nothing contained in this article shall in any manner derogate from the ordinances published in Sweden against emigrations, or which may hereafter be published, which shall remain in full force and vigour. The United States on their part, or any of them, shall be at liberty to make respecting this matter, such laws as they think proper."

It was at one time supposed that the phrase "goods and effects" in this article did not cover real property, a construction which was due in some measure to the view that the treaties of the United States could not affect the operation of the laws of the several States of the Union with respect to the inheritance of land. Opinion of Attorney General Wirt, July 30, 1819, 1 Op. A. G. 275. This view of the treaty-making power of the United States is not tenable. *Hauenstein* v. *Lynham,* 100 U. S. 483, 489; *Geofroy* v. *Riggs,* 133 U. S. 258, 266, 267; *Sullivan* v. *Kidd,* 254 U. S. 433; *Nielsen* v. *Johnson,* 279 U. S. 47.

The text of the treaty of 1783 with Sweden was in French only, and the French text is therefore controlling. The phrase "goods and effects" is a translation of the French expression *"fonds et biens."* The French word *"biens"* has a wider significance than the English word "goods" (used by the American translator) and embraces real property. Story observed upon this point: "The term *'biens,'* in the sense of the civilians and continental jurists, comprehends not merely goods and chattels as in the common law, but real estate." Conflict of Laws, chap. 1, sec. 13, *note.* In a note addressed by the Swedish Minister at Washington to the Department of State under date of December 12, 1910, in response to an inquiry by the Secretary of State of the United States, the Swedish Minister stated his understanding that the authorities in Sweden had always held that the words "goods and effects" in article 6 of the treaty of 1783 include real estate. This view has been taken in judicial decisions in this country. *Adams* v. *Akerlund,* 168 Ill. 632; *Erickson* v. *Carlson,* 95 Neb. 182. We think that it is the correct construction of the article of the treaty, applying the fundamental principle that treaties should receive a liberal interpretation to give effect to their apparent purpose. *Geofroy* v. *Riggs, supra; Tucker* v. *Alexandroff,* 183 U. S. 424, 437; *Jordan* v. *Tashiro,* 278 U. S. 123, 128; *Nielsen* v. *Johnson, supra.*

The question remains whether the treaty operates to override the law of the State as to the disposition of homestead property. If so, it would appear to place an alien owner of a homestead in Nebraska on a better footing than that of a citizen of the State. This conclusion seems to us to be repugnant to the purpose of the treaty. While treaties, in safeguarding important rights in the interest of reciprocal beneficial relations, may by their express terms afford a measure of protection to aliens which citizens of one or both of the parties may not be

able to demand against their own government, the general purpose of treaties of amity and commerce is to avoid injurious discrimination in either country against the citizens of the other. Compare *Frederickson* v. *Louisiana*, 23 How. 445, 447; *Geofroy* v. *Riggs, supra; Maiorano* v. *Baltimore & Ohio R. R. Co.*, 213 U. S. 268; *Patsone* v. *Pennsylvania*, 232 U. S. 138; *Petersen* v. *Iowa*, 245 U. S. 170; *Duus* v. *Brown*, 245 U. S. 176; *Sullivan* v. *Kidd, supra.* This purpose is indicated in the recital of the treaty of 1783 with Sweden that the high contracting parties thought that they could not better accomplish the end they had in view " than by taking for a basis of their arrangements the mutual interest and advantage of both nations, thereby avoiding all those burthensome preferences, which are usually sources of debate, embarrassment and discontent."

It is not to be supposed that the treaty intended to secure the right of disposition in any manner whatever regardless of reasonable regulations in accordance with the property law of the country of location, bearing upon aliens and citizens alike. For example, conveyances of land would still be subject to non-discriminatory provisions as to form or recording. Nor can the right to " dispose," secured by the treaty, be deemed to give a wholly unrestricted right to the alien to acquire property, without regard to reasonable requirements relating to particular kinds of property and imposed upon both aliens and citizens without discrimination.

It is true that the policy of Nebraska with respect to the selection of homesteads was established after the treaty in question was made. (General Laws, Nebraska, 1879, pp. 57, *et seq.*) But we find no ground for the conclusion that in establishing this reasonable policy Nebraska took any action which was inconsistent with the provisions of the treaty. The citizens of Norway and Sweden who settled in Nebraska had no reason to com-

plain of that policy and had obtained no right to ignore it. The homestead property under the law of Nebraska has a special quality. It is exempt from judgment liens and from executions or forced sale, except as specially provided (Nebraska, Comp. St. 1922, sec. 2816). The acquisition of the homestead with these incidents depends upon the *bona fide* intention to make it a home. *Hair* v. *Davenport,* 74 Neb. 117. It is because of this quality that it enjoys special privileges, and that it cannot be conveyed or encumbered unless the instrument is executed and acknowledged by both husband and wife.

When Knudson selected the homestead, he sought the advantages of the provisions of the local law as to homesteads, and he could not properly obtain the benefits of these provisions without accepting the property with the quality which the law attached to it. If he had not been entitled to establish the homestead, and thus his acquisition lay outside of the homestead law, it would be clear that the statutory provision against disposition of the homestead would have no application and there would have been no occasion for the Supreme Court of the State to cite the provisions of the treaty in order to strike down the prohibition against conveying the property. We are unable to see that anything in the treaty, which was continued in force with Norway, gave Knudson the right to establish a homestead and then hold it free from the restrictions which governed it as a homestead, restrictions which operated upon every citizen of Nebraska who owned a homestead.

Our conclusion is that the treaty did not invalidate the provisions of the Nebraska statute as applied to the present case in relation to the disposition of the land considered as homestead property.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*