# United States Court of Appeals
## For the First Circuit

No. 12-2143

RONNIE FULWOOD,

Plaintiff, Appellant,

MORTIMER OFF SHORE LTD.,

Plaintiff,

v.

FEDERAL REPUBLIC OF GERMANY,

Defendant,

NORDDEUTSCHE LANDESBANK GIROZENTRALE; HSH NORDBANK AG;
WESTLB AG; HELABA LANDESBANK HESSEN-THUERINGEN;
LBBW LANDESBANK BADEN-WUERTTEMBERG,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

Robert A. Scher, with whom Rachel Kramer and Foley & Lardner
LLP were on brief, for appellant.
Jeffrey Harris, with whom, Max Riederer von Paar, Walter E.
Diercks, Rubin, Winston, Diercks, Harris & Cooke, LLP, Evan Fray-
Witzer, and Ciampa Fray-Witzer, LLP were on brief, for appellees.

October 30, 2013

**LYNCH, Chief Judge.** Within the last decade, bondholders who acquired old German Agra Bonds issued in 1928 to aid Germany's agricultural recovery from World War I have sued both the Federal Republic of Germany and enumerated German Banks in the federal courts for payment on the bonds. Two plaintiffs in 2010 brought such suits in federal court in Massachusetts, seeking over $7 billion in accrued principal and interest on some 1,694 Agra Bonds.

Several post World War II international treaties to which the United States is a signatory were meant to distinguish invalid bonds and to settle valid debts, including the Agra Bonds, and governed how such bonds were to be validated. Under a 1953 treaty, the courts of the United States could be used for enforcement of such bonds only under certain conditions, requiring prior use of enumerated validation procedures. Appellant owns and is attempting to collect payment on non-validated bonds. The Massachusetts district court dismissed the two suits, as pertinent to this appeal, for failure to meet those conditions. One of the claimants, Ronnie Fulwood, appeals from the dismissal of his claims against the defendant German Banks, but does not appeal as to the dismissal of his claims against Germany.

We affirm. Our holding is in accord with two other circuits that have addressed similar issues. See World Holdings, LLC v. Fed. Republic of Germany, 701 F.3d 641 (11th Cir. 2012), cert. denied, No. 12-1498, 2013 WL 3229961 (U.S. Oct. 7, 2013);

-3-

<u>Mortimer Off Shore Servs., Ltd.</u> v. <u>Fed. Republic of Germany</u>, 615 F.3d 97 (2d Cir. 2010) ("<u>Mortimer I</u>").[1]

I.

Fulwood seeks to recover the accrued principal and interest on 83 pre-World War II bearer bonds entitled "German Provincial & Communal Bank Consolidated Agricultural Loan US$1000 Secured Sinking Fund Gold Bonds Series A 6-1/2% Dated June 1928 -- Due June 1, 1958" ("Agra Bonds").  On June 1, 1928, a consortium of 14 provincial banks located within the state of Prussia, a political subdivision of Germany, issued the Agra Bonds in an effort to finance improvements to the state's agricultural infrastructure.  <u>Mortimer I</u>, 615 F.3d at 99.  The bonds were listed on the New York Stock Exchange and marketed in the United States. <u>Id.</u>  Principal and interest was payable in Boston, Chicago, or New York City.  Each of the 14 issuing banks was severally liable for a stated percentage of each bond.  Each bank was owned in whole or in part by the province in which it was located, with each province guaranteeing the obligations of the banks located therein.  The

---

[1] Fulwood also argues on appeal that the district court erred in denying his motion to supplement the record with an Indenture Fulwood claims shows any defense based upon the April 1953 Treaty has been waived.  This court reviews a district court's denial of a motion to supplement for abuse of discretion.  <u>See</u> <u>United States</u> v. <u>Union Bank for Sav. & Inv. (Jordan)</u>, 487 F.3d 8, 23 (1st Cir. 2007).  We find no abuse here.  The Indenture at issue was publically available in the Stanford University Libraries and could have been discovered earlier.  Moreover, Fulwood waited more than four months after the Indenture's actual discovery to file his motion to supplement.

bonds are the obligations of the issuing banks and their "guarantors and successors." The Banks against which Fulwood has filed suit are the alleged successors of some of the issuing banks. Germany is alleged to have assumed the obligations of the provincial guarantors.

A.        Historical Background

In 1933, following the rise of the Nazi Party, the Third Reich issued a moratorium on payment of bonds, including payment on Agra Bonds. That moratorium ended up remaining in effect until after the end of World War II. After declaring the moratorium, the Third Reich began a concerted effort to repurchase outstanding bonds for eventual retirement. After the start of the second World War, however, "it became 'impossible to present such bonds to the American trustees or paying agents for cancellation.'" Mortimer I, 615 F.3d at 101 (quoting Abrey v. Reusch, 153 F. Supp. 337, 339 (S.D.N.Y. 1957)). "As a result, German bank vaults held 'large numbers' of reacquired, yet uncancelled foreign currency bonds, in negotiable form, that 'no longer represented valid obligations.'" Id. (quoting Abrey, 153 F. Supp. at 339). Following the Third Reich's surrender in 1945, Allied forces, including those of the Soviet Union, occupied portions of Berlin until 1949. During this period, Soviet troops seized and returned to circulation many of those invalid bonds. These bonds "posed a significant problem,

-5-

both domestically and internationally."  Id. at 101.  That was so given the

> real possibility that the eventual holders of the looted bonds would share the available assets . . . of the German obligors equally with the legitimate bondholders, a large number of whom were nationals of the United States. Moreover, the free and open trading in the United States of all German Dollar Bonds was impeded by the [resulting] uncertainties . . . .

Id. (alterations in original) (quoting Abrey, 153 F. Supp. at 339).

In 1949, several years after the end of World War II, the German Reich lands were divided into East and West Germany.  The land that was once Prussia was split between the two nations.  In 1951, West Germany entered into negotiations with creditor nations to address its outstanding debt.  The result of those negotiations was the 1953 multilateral treaty between West Germany, the United States, and twenty other creditor nations known as the London Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 445 ("London Debt Agreement").  The London Debt Agreement created a framework for resolving claims against the West German government and constituted an offer of settlement to all holders of bonds covered by the Agreement.  Id. at 453.  If a bondholder assented to the offer of settlement, she would be guaranteed payment, albeit at a lesser rate than the one to which she would have otherwise been entitled.  See World Holdings, LLC, 701 F.3d at 646.  If a bondholder did not assent to the settlement offer, her preexisting

rights of enforcement were not waived. See id. Non-assenters were, however, barred from bringing a recovery action until after all assenting bondholders had been paid in full. See id.

As a condition on payment, bondholders assenting to the London Debt Agreement's offer of settlement agreed to subject their bonds to a validation process "on the basis of the German Validation Law passed by its Parliament and about to be enacted." London Debt Agreement, 4 U.S.T. at 527. West Germany enacted the German Validation Law on August 25, 1952 out of a concern over the redemption of looted bonds. Mortimer I, 615 F.3d at 101-02. Under the Validation Law, validation required that bonds be registered, submitted with supporting evidence, and approved by a Board for the Validation of German Bonds in the United States, in Germany, or the country of offering following an administrative hearing. See Validation of Dollar Bonds of German Issue, U.S.-Fed. Rep. Ger., Feb. 27, 1953, 4 U.S.T. 797, 839-42 ("February 1953 Treaty"). Bondholders were given the opportunity to register their bonds within five years of the applicable "opening date."[2] Id. at 839.

_____

[2] In relevant part:
(1) The opening Date within the meaning of this Law is, in respect of the types of bonds listed in the Schedule of Foreign Currency Bonds, the first day after the expiration of six months from the effective date of the Law.
(2) The Federal Government may, by Ordinance, establish in respect of bonds of a certain type
      1. an earlier Opening Date, if appropriate examination of registrations by the Foreign Representative and the Examining Agency is

Late registration was allowed only if failure to register within the specified period was "without . . . fault."  Id. at 855.

West Germany and the United States entered into two related bilateral treaties in 1953, which were negotiated at the same time as the London Debt Agreement.  The first, signed February 27, 1953, incorporated the validation procedures set out in the German Validation Law.  February 1953 Treaty, 4 U.S.T. at 801-02.  Significantly, the February 1953 Treaty established the Board for the Validation of German Bonds in the United States in New York City to adjudicate validation claims in the United States, along with twelve regional Arbitration Boards throughout the United States to review the decisions of the Validation Board.  Id. at 803, 805, 824-25.

April 1, 1953 Treaty

The second treaty, signed April 1, 1953, is of even more significance.  It set forth the limited conditions for the enforcement of outstanding German bonds in the U.S. courts.  Article II of the April 1953 Treaty provides:

> No bond . . . referred to in the first sentence of Article I above shall be enforceable unless and until it shall be

---

> already assured on such date, or
> 2. an Opening Date not more than six months later, if the Foreign Representative or the Examining Agency are not able to commence appropriate examination of the registrations before such date.

February 1953 Treaty, 4 U.S.T. at 838-839.

> validated either by the Board for Validation of German Bonds in the United States established by the Agreement on Validation Procedures, or by the authorities competent for that purpose in the Federal Republic.

Certain Matters Arising from the Validation of German Dollar Bonds, U.S.-Fed. Rep. Ger., Apr. 1, 1953, 4 U.S.T. 885, 889 ("April 1953 Treaty").

It is undisputed that the bonds at issue are referred to in Article I. Article I of the April 1953 Treaty refers to "bonds . . . listed in the . . . Schedule" of foreign currency bonds appended to the German Validation Law. Id. Agra Bonds are listed as item 19 in section C.IV of that Schedule. February 1953 Treaty, 4 U.S.T. at 877. It is also clear the bonds at issue were never validated (indeed, no attempt was ever made to do so) by the Validation Board in the United States. And it is clear that the bonds have never been validated by authorities competent for that purpose in the Federal Republic.

B.      Procedural Background

We describe the dismissal of Mortimer's complaint, which has not been appealed, to provide context. On March 28, 2012, the district court dismissed Mortimer's claims against Germany, holding that those claims were barred by either res judicata or collateral estoppel from an earlier 2005 action Mortimer had filed in New York seeking payment on 351 of the 1,611 Agra Bonds on which he was seeking to recover in the present action. See Mortimer Off Shore

<u>Servs., Ltd.</u> v. <u>Fed. Republic of Germany</u>, No. 10-11551-RWZ, 2012 WL 1067648 (D. Mass. Mar. 28, 2012) ("<u>Mortimer II</u>").[3]

In that same March 28, 2012 order, the district court dismissed both Mortimer's and appellant Fulwood's claims against the Banks, holding that Fulwood's claims failed because "the Validation Law and [the April] 1953 Treaty apply to West German

---

[3] The New York district court in the earlier action had dismissed Mortimer's complaint for failure to state a claim, holding that, under the April 1953 Treaty, Mortimer's failure to validate its bonds in accordance with procedures set out in the German Validation Law rendered those bonds unenforceable in U.S. courts. <u>See</u> <u>Mortimer I</u>, 615 F.3d at 104. The Second Circuit affirmed, holding that Mortimer could not seek to enforce the bonds issued in territory that became West Germany without first complying with the German Validation Law's requirements. <u>Id.</u> at 113-17. As to the bonds issued in territory that became East Germany, the Second Circuit affirmed on the alternative ground that Mortimer had failed to make the threshold showing necessary to invoke an exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq. ("FSIA"), and so the district court lacked subject matter jurisdiction over Mortimer's claims based upon those bonds. <u>Mortimer I</u>, 615 F.3d at 112-13. Under the FSIA, a foreign state "shall be immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604, unless one of the FSIA's exceptions, <u>id.</u> §§ 1605-07, applies.
Mortimer's claims in Massachusetts against Germany based upon West German bonds were barred on res judicata grounds because (1) the parties in the two actions are identical; (2) the two actions "indisputably arose out of the same operative nucleus of facts"; and (3) the earlier judgment as to those bonds was "on the merits" and hence final. <u>Mortimer II</u>, 2012 WL 1067648, at *6-9 (citing <u>Havercombe</u> v. <u>Dep't of Educ. of the Commonwealth of P.R.</u>, 250 F.3d 1, 3 (1st Cir. 2001)). Because the Second Circuit "reached a valid, binding, final judgment" on the issue of whether the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2), renders Germany subject to suit with respect to such bonds, a theory Mortimer relied upon again here, Mortimer's claims based upon East German bonds were barred by collateral estoppel. <u>Id.</u> at *10 (citing <u>Grella</u> v. <u>Salem Five Cent Sav. Bank</u>, 42 F.3d 26, 30 (1st Cir. 1994)).

-10-

debt, plaintiffs concede that the Defendant Banks hold only West German debt, and plaintiffs admittedly have failed to comply with the Validation Law." Id. at *12.[4] In so holding, the district court relied upon the Second Circuit's decision in Mortimer I. See id. The district court dismissed Fulwood's claims against Germany based upon the West German bonds on the same ground. Id. at *11.

In an order dated August 21, 2012, the district court dismissed Fulwood's claims against Germany based upon the indemnity of the East German bonds for lack of subject matter jurisdiction, holding that the FSIA precluded consideration of Fulwood's claims. Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, No. 10-11551-RWZ, 2012 WL 3600840, at *2-3 (D. Mass. Aug. 21, 2012). The district court rejected Fulwood's argument that his claims against Germany were permitted under the FSIA's commercial activity exception, holding that even if, as Fulwood alleged, Germany is "identical" to the pre-World War II German Reich and is the legal successor to its political subdivisions, including both Prussia and East Germany, "mere accession to liability is not a commercial action under the FSIA." Id. at *2; see also Mortimer I, 615 F.3d at 110 ("Accession to liability by the rules of customary international law entails no action by the successor state with respect to the commercial activity at issue -- the assumption of

_____

[4] Mortimer's claims against the Banks were barred by collateral estoppel. Mortimer II, 2012 WL 1067648, at *11.

-11-

liability.  The state performs no action when it automatically assumes liability.").

Fulwood now appeals the portion of the March 28, 2012 order dismissing his claims against the West German Banks.

## II.

Fulwood's main argument is that the April 1953 Treaty's verification requirements do not apply to his bonds but apply to only those bondholders who assented to settlement under the London Debt Agreement, which he did not.

"This case presents a pure issue of law.  Our review of a grant of a motion to dismiss is de novo."  Providence Sch. Dep't v. Ana C., 108 F.3d 1, 2 (1st Cir. 1997).

"The interpretation of a treaty, like the interpretation of a statute, begins with its text."  Medellín v. Texas, 552 U.S. 491, 506 (2008).  "We also take into account the signatories' intentions and expectations."  Yaman v. Yaman, ___ F.3d ___, No. 13-1240, 2013 WL 4827587, at *7 (1st Cir. Sept. 11, 2013). Further, "[i]t is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'"  Abbott v. Abbott, 130 S. Ct. 1983, 1993 (2010) (quoting Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 185 (1982)).

Fulwood's interpretation conflicts with the Treaty's clear text and the Executive Branch's interpretation.  See United States v. Kin-Hong, 110 F.3d 103, 106 (1st Cir. 1997)

-12-

("[S]eparation of powers principles . . . preclude us from rewriting the treaties which the President and the Senate have approved."). It is also inconsistent with the Treaty's apparent purpose of preventing the enforcement of invalid bonds in U.S. courts. See Todok v. Union State Bank of Harvard, Neb., 281 U.S. 449, 454 (1930) (rejecting an interpretation that "seems to us to be repugnant to the purpose of the treaty").

Under Article II of the April 1953 Treaty, "[n]o bond . . . referred to in the first sentence of Article I . . . shall be enforceable unless and until it shall be validated." 4 U.S.T. at 889. Fulwood does not contest -- nor could he -- that Agra Bonds are "referred to in the first sentence of Article I." Fulwood is thus left to argue from weakness that "[n]o bond" means something other than no bond.

Fulwood attempts to construct an edifice, starting with language from the Treaty's Preamble, which provides:

> [F]urther measures are required to permit debtors and creditors to proceed to the orderly settlement of the obligations arising from German dollar bonds with confidence in the stability of the procedures regarding validation and with assurance that claims prejudicial to such settlement will not be asserted on the basis of bonds which were unlawfully acquired[.]

Id. at 888 (emphasis added). The term "settlement" as used in the Preamble, he argues, is a term of art, referring specifically to the offer of settlement extended by the London Debt Agreement.

-13-

From this, Fulwood says it is a necessary inference that the purpose of the April 1953 Treaty is merely to promote the voluntary settlement of claims under the London Debt Agreement. And based upon this understanding of the treaty's purpose from its Preamble, Fulwood concludes that "bonds" as used Article II of the treaty refers only to bonds held by those who assented to settlement under the Agreement, as he did not. But Article II does not use the term "settlement" and its text is not ambiguous. The argument fails in its reliance on the Preamble rather than the text at issue.

But even were we to look to the Preamble to interpret Article II, his argument still fails. To support his limited term-of-art interpretation of the word "settlement," used in the Preamble but not in Article II, Fulwood cites both the technical definitions of the terms "settled" and "settlement" as set forth in the London Debt Agreement[5] as well as the fact that the Debt Agreement, the German Validation Law, and the two bilateral treaties between West Germany and the United States that were

---

[5] In relevant part:
(k)"settled," in relation to a debt, means that terms of payment and other conditions have been established for such debt in accordance with the provisions of the present Agreement and the Annexes thereto, by agreement between the creditor and debtor, or, in proceedings between the creditor and debtor, by final judgment or order of a court or by final decision of an arbitral body;
(l) "settlement," in relation to a debt, means the establishment of terms of payment and other conditions in accordance with paragraph (k).
London Debt Agreement, 4 U.S.T. at 448.

negotiated and enacted contemporaneously.[6]  We agree with the Eleventh Circuit's observation in World Holdings, LLC v. Federal Republic of Germany that the term "settlement" as used in the Preamble also has familiar, non-technical readings, referring either to "[a]n agreement ending a dispute or lawsuit" or a "[p]ayment, satisfaction, or final adjustment."  701 F.3d at 652 (alteration in the original) (quoting Black's Law Dictionary 1496, 1497 (9th ed. 2009)).  Given these common usages, it would be irrational to conclude the drafters of the April 1953 Treaty intended to limit the scope of Article II by giving a limited technical meaning to a term in the preamble.

Nor could one deduce from the Preamble's three references to "settlement" that the April 1953 Treaty's sole purpose was to facilitate the "settlement" of the assenters to the London Debt Agreement, and it had no purpose as to non-assenters.  Indeed, the Preamble's first paragraph rules that out.  It identifies as the overarching basis for the treaty the "agree[ment]" between the United States and West Germany that:

> [I]t is in their common interest to provide for the determination of the validity of German dollar bonds in view of the possibility that a large number of such bonds may have been unlawfully acquired during hostilities in Germany or soon thereafter . . . .

_____

[6] As Fulwood observes, the February 1953 Treaty also uses language of "settlement."  See 4 U.S.T. at 801-02 (referring to "the settlement of claims").  Like the April 1953 Treaty, the February 1953 Treaty does not expressly define the term.

-15-

4 U.S.T. at 887 (emphasis added). The April 1953 Treaty was motivated at least in part by a concern over the instability that would result from the redemption of looted bonds. See also February 1953 Treaty, 4 U.S.T. at 798-99 (observing that "bonds may have fallen unlawfully into the hands of persons who will seek to negotiate them, or to make claim under them against the debtors, trustees or paying agents, or otherwise to profit from their unlawful acquisition"). This concern applies both to assenters and non-assenters. The April 1953 Treaty has the broader purpose of preventing the enforcement of wrongfully acquired bonds.

That the April 1953 Treaty was not limited as Fulwood argues is reinforced by a 1953 message from President Eisenhower to the Senate. See Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 348 (2005) (noting judiciary's "customary policy of deference to the President in matters of foreign affairs"). That Message, which accompanied both of the 1953 bilateral treaties when they were sent to the Senate for ratification, begins with the observation that a large number of German bonds "found their way into unauthorized hands after the occupation of Berlin." Message from the President of the United States, Enclosure 7(d), annexed to Hearings Before the Committee on Foreign Relations, 83rd Congress, 1st Sess. 230 (1953). The Message goes on to explain that, on December 9, 1941, trading of German securities was suspended on U.S. exchanges at the request of the Securities and Exchange

Commission; the suspension was kept in place after World War II and would remain "until measures have been taken which will ensure that the looted bonds do not find a market in the United States." Id. The Message continues, "If no action were taken to deal with this situation, the Soviet Government could introduce these unlawfully held bonds into our security markets upon the resumption of trading." Id.

Significantly, the Message describes the February 1953 Treaty as "outlin[ing] the procedure for validation," the purpose of which "will be to separate bonds legitimately held from those which disappeared after the occupation." Id. at 231. The Message then remarks that "a further measure" -- the April 1953 Treaty -- "was required to prevent the holders of looted bonds from using the processes of American courts to enforce payment upon them." Id. The Message states: "[The April 1953 Treaty] provides that the holders of dollar bonds that have not been duly validated cannot resort to courts in the United States for the purpose of enforcing their rights under such bonds." Id.; see also id. (characterizing the April 1953 Treaty as "the agreement denying holders of non-validated bonds the right to resort to courts in the United States"). The Treaty's verification requirements apply to London Debt Agreement assenters and non-assenters alike. After all, if holders of looted bonds could enforce payment simply by waiting until assenting bondholders had been paid in full, the Treaty's

verification "requirement" would be utterly without bite.  See World Holdings, LLC, 701 F.3d at 646 ("If a bondholder refused to accept the settlement offer, he maintained his preexisting rights of enforcement.")  We will not interpret Article II of the April 1953 Treaty in a way that "makes nonsense of it."  Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 498 n.12 (1968) (quoting United States v. Aluminum Co. of Am., 148 F.2d 416, 432 (2d Cir. 1945)).

In a last-ditch effort, Fulwood argues if the April 1953 Treaty's validation requirement were to apply to assenters and non-assenters alike, that requirement would be inconsistent with the voluntary nature of the London Debt Agreement's offer of settlement.  The argument would not undercut our reading of Article II in any event; regardless, it fails in its own terms.

Fulwood reasons that if the April 1953 Treaty makes validation in accordance with the German Validation Law a condition of enforcement even for non-assenters, the Treaty would require, barring a valid excuse, registration for validation within the applicable five-year period from 1953 through 1958.  However, because the London Debt Agreement prohibited non-assenters from bringing an enforcement action prior to the resolution of all claims by assenters -- a point he says went well beyond the expiration of any applicable five-year period -- Fulwood contends that the only way for a bondholder to comply with the validation

-18-

requirement would be for her to assent to the London Debt Agreement's offer of settlement.

This argument, even within its own terms, is without merit, resting on a conflation of the different concepts of enforcement and validation. The London Debt Agreement gives priority to assenters as to <u>enforcement</u>, barring non-assenters from pursuing enforcement actions until all assenters have been paid in full. On the other hand, the Agreement gives no priority to assenters as to <u>validation</u>, stating only: "Payment on bonds . . . which require validation under the German validation procedure shall not be made until such bonds . . . shall have been validated pursuant thereto." London Debt Agreement, 4 U.S.T. at 527. The German Validation Law in turn draws no distinction between assenters and non-assenters, thus providing assenters and non-assenters the same opportunity to register their bonds for validation within five years of the applicable opening date. <u>See</u> February 1953 Treaty, 4 U.S.T. at 839. Likewise, the Validation Law provides both assenters and non-assenters the opportunity to register their bonds for validation even after the expiration of the applicable five-year period if "the failure to register [those bonds] timely was not due to [the bondholder's] own gross negligence."[7] <u>Id.</u> at 856. The February 1953 Treaty incorporated

_____

[7] All U.S. Validation Boards established by the February 1953 Treaty appear to have been dissolved by 1960. However, it remains open to a bondholder to seek validation from "authorities competent

the German Validation Law in full.  See 4 U.S.T. at 801-02.  As such, the April 1953 Treaty's conditioning the enforcement of bonds in U.S. courts on their validation in accordance with the Validation Law created no incentive whatsoever for bondholders to assent to the London Debt Agreement's offer of settlement.[8]

### III.

Under the April 1953 Treaty, these Agra Bonds are enforceable in U.S. courts only if they have been validated. Fulwood's bonds have not been validated and are unenforceable in U.S. courts.  The district court's dismissal of Fulwood's claims against the Banks is affirmed.  Costs are awarded to the Banks.

---

for that purpose" in Germany.  April 1953 Treaty, 4 U.S.T. at 889.

[8] At oral argument, Fulwood made the additional argument that the April 1953 Treaty's verification requirements apply only as to the enforcement of listed bonds against Germany. Fulwood failed to raise this argument in his opening brief before this court, and it is waived.  United States v. Pakala, 568 F.3d 47, 57 (1st Cir. 2009) ("We have consistently held that arguments not raised in the initial appellate legal brief are considered waived." (quoting United States v. Capozzi, 486 F.3d 711, 719 n.2 (1st Cir. 2007)) (internal quotation marks omitted)).  Waiver aside, the argument has no merit, lacking any textual basis whatsoever.  See, e.g., April 1953 Treaty, 4 U.S.T. at 888 ("[T]he United States and [Germany] agree that further measures are required to permit debtors and creditors to proceed to the orderly settlement of . . . obligations . . . ." (emphasis added)).